2010 WL 3338958
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

BGA, LLC and the Western Mohegan Tribe
& Nation of the State of New York, Plaintiffs,
v.
ULSTER COUNTY, NEW YORK, Defendant.

No. 1:08–cv–149 (GLS/RFT).
|
Aug. 24, 2010.

**Attorneys and Law Firms**

Todtman, Nachamie Law Firm, Barton Nachamie, Esq., Jill L. Makower, Esq., of Counsel, New York, NY, for the Plaintiffs.

Maynard, O'Connor Law Firm, Adam T. Mandell, Esq., Michael E. Catalinotto, Jr., Esq., of Counsel, Saugerties, NY, Office of Ulster County Attorney, Joshua N. Koplovitz, Esq., of Counsel, Kingston, NY, for the Defendant.

## *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

*1 Plaintiffs BGA, LLC and The Western Mohegan Tribe and Nation of the State of New York brought this action against Ulster County, New York. They allege breach of contract and a violation of the Nonintercourse Act,[1] and seek damages, specific performance, and declaratory and injunctive relief. (Compl., Dkt. No. 1.) Pending are the County's motion to dismiss plaintiffs' complaint pursuant to FED. R. CIV. P. 12(b)(1) and for summary judgment pursuant to FED. R. CIV P. 56(c). (Dkt. No. 48.) For the reasons that follow, the County's motion to dismiss is denied, but its motion for summary judgment is granted.

### II. *Background*

#### A. *The Agreement*

Plaintiff Tribe is a group of American Indians that calls itself the "Western Mohegan Tribe and Nation of the State of New York." On January 5, 2001, the Tribe entered into an agreement with defendant Ulster County to purchase a parcel of land known as the "Tamarack property." (*See* Def. SMF ¶ 4, Dkt. No. 48:15.) The County conveyed the property in consideration for, *inter alia,* the settlement of the Tribe's pending land claims against the County, as well as the payment of $900,000 in satisfaction of past real estate tax liens on the property, which plaintiff BGA[2] advanced on the Tribe's behalf. (*Id.; see also* Compl. ¶¶ 60–61, Dkt. No. 1.) The agreement was authorized by the Ulster County Legislature in Resolution Number 376 (the Resolution). (*Id.* at ¶ 22.) In relevant part, the Agreement provides as follows:

A. *Agreement of the Parties*

1. *Agreements of the County.* In consideration of the payment of $900,000 by the Tribe and in full and complete satisfaction and settlement of any and all claims which the Tribe may have against the County or any other property owners as to lands in Ulster County, ... the County ... has:

(a) Adopted a resolution authorizing this Agreement to include the following matters (collectively, the "Resolutions"), in form and substance substantially as follows:

....

(ii) The County shall agree and accept in full consideration of the payment of any and all taxes, liens and other obligations due and owing as of the date hereof to the County ... in respect of the Subject Property, the aggregate sum of $900,000, and the payment of current years school and general property taxes [,] ... which the tribe will pay on closing....

(iii) To the extent it is so authorized, the County agrees and accepts that the uses and purposes

of the Real Property as may be placed in Trust as Indian Country shall be solely determined by the traditional government of the Tribe.

(iv) Except for the current year's school and general property taxes, ... which the tribe will pay on closing, the County shall release the Tribe from any and all taxes, liens and other obligations due and owing to the County or any other local County governmental agency in respect of the Real Property and understands that the property may be tax exempt in future tax years in which event the Tribe agrees to make payments in lieu of taxes to the County for any tax year in which the property is tax exempt....

**\*2** (Mandell Aff., Ex. B, Agreement and Mutual Release, Dkt. No. 48:2.) The agreement further sets forth the terms governing the making of "PILOT payments," or the "payments in lieu of taxes," referenced in § A(1)(a)(iv). Specifically, the agreement provides that "[o]n or before March 1 of every tax year that the property is exempt from payment of property taxes, the Tribe shall deliver to the County Treasurer the [PILOT payment required under the Agreement]," which is to be "the greater of $25,000 per year or five percent ... of the annual 'net revenues' ... generated by the Tribe from activities in which it may engage on the Real Property, up to a maximum of $250,000 per annum." (*Id.* at §§ A(1)(a)(iv)(1),(2).)

### B. *Factual History and Prior Proceedings*

In 2002, the Tribe submitted to the County a $25,000 PILOT payment in lieu of that year's property taxes. (*See* Compl. ¶ 72, Dkt. No. 1; Answer ¶ 1, Dkt. No. 6.) In a letter dated January 17, 2003, the Ulster County Treasurer's Office, relying on the 2001 agreement, rejected the payment and demanded that the 2002 property tax in the amount of $58,436.85 be paid. (Mandell Aff., Ex. G, Letter at 1, Dkt. No. 48:3.) According to the County, the agreement did not obligate it to accept a PILOT payment until the property became tax exempt, which it had not. (*See* Def. Mem. of Law at 27, Dkt. No. 48:14; *see also* Def. SMF ¶¶ 27–29, Dkt. No. 48:15.)

In 2004, after the Tribe had refused to pay the regular taxes on the property, the County applied for a tax foreclosure judgment in Ulster County Court. In granting the application, Judge Michael Bruhn found that the property was not immune from taxation and foreclosure, either on the basis of the Tribe's alleged sovereignty or under the 2001 Agreement. (*See* Mandell Aff., Ex. P, Judgment of Foreclosure at 1–3, Dkt. No. 48:10.)

In 2006, BGA and the Tribe commenced an action in this court against the County, the County Clerk, and the County Treasurer, alleging breach of contract, and seeking federal recognition of the Tribe's sovereignty as an Indian Nation and exemption from future taxation of tribal property in Ulster County. *See BGA, LLC v. Ulster County, N.Y.,* No. 1:06–CV–0095, 2007 WL 2454220 (N.D.N.Y. Aug. 23, 2007). During the pendency of that litigation, however, the parties entered into a settlement agreement which provided that the Ulster County Court foreclosure judgment would be treated as null and void,[3] and that plaintiffs would discontinue their claims for monetary damages and pursue only their request for declaratory relief. (*See* Mandell Aff., Ex. C, Settlement Agreement at 2–3, Dkt. No. 48:2.) Plaintiffs amended their complaint accordingly. *BGA, LLC,* 2007 WL 2454220, at \*1 n. 5.

Subsequently, on August 23, 2007, this court dismissed plaintiffs' amended complaint for lack of subject matter jurisdiction, holding that no genuine case or controversy existed. *See id.* at \*2. On motion for reconsideration, this court affirmed that decision and further held that, regardless of whether a justiciable controversy existed, it declined to exercise jurisdiction over the declaratory judgment action. *BGA, LLC v. Ulster County, N. Y.,* No. 1:06–CV–0095, 2008 WL 84591, at \*1–3 (N.D.N.Y. Jan. 7, 2008). The Second Circuit affirmed the dismissal of plaintiffs' claims. *BGA, LLC v. Ulster County, N.Y.,* 320 Fed. Appx. 92 (2d. Cir.2009).

### C. *Current Action*

**\*3** On February 8, 2008, the Tribe and BGA commenced the present action against the County, alleging breach of the January 5, 2001 Agreement between the Tribe and the County, and a violation of the Nonintercourse Act. (*See* Compl., Dkt. No.

1.) Plaintiffs also seek a declaration that the Tribe is a sovereign Indian Nation and that the Tamarack property is "Indian Country." (*See id.*) Relatedly, in addition to monetary damages, plaintiffs seek specific performance of the 2001 Agreement and an injunction prohibiting the County from seeking to collect taxes or payments other than the PILOT payments set forth in the Agreement. (*See id* .) The County now moves to dismiss plaintiffs' complaint pursuant to FED. R. CIV. P. 12(b)(1) and for summary judgment pursuant to FED. R. CIV P. 56. (*See* Dkt. No. 48.)

### III. *Standards of Review*

The standards for judgment pursuant to Federal Rules of Civil Procedure 12(b)(1) and 56 are well established and will not be repeated here. For a full discussion of the standards, the court refers the parties to its previous opinions in *Bain v. Town of Argyle,* 499 F.Supp.2d 192, 194–95 (N.D.N.Y.2007) (Rule 56); and *Hunt v. United States,* No. 1:07–CV–0112, 2007 WL 2406912, at *1 (N.D.N.Y. Aug. 21, 2007) (Rule 12(b)(1)).

### IV. *Discussion*

#### A. *The Rooker–Feldman Doctrine & Rule 12(b)(1)*

The County contends that plaintiffs' claims are barred by the *Rooker–Feldman* doctrine in light of the Ulster County Court's foreclosure judgment.[4] Plaintiffs counter that *Rooker–Feldman* is inapplicable to their current claims.

The *Rooker–Feldman* doctrine derives from the principle that "lower federal courts lack jurisdiction to engage in appellate review of state-court determinations." *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 21 (1987) (Brennan, J., concurring); *see also Kropelnicki v. Siegel,* 290 F.3d 118, 128 (2d Cir.2002) (noting that the *Rooker–Feldman* doctrine "seeks to prevent state and federal courts from fighting each other for control of a particular case" (citation and internal quotation marks omitted)). In essence, the doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments ... and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005).

In this Circuit, the *Rooker–Feldman* doctrine bars a plaintiff's claims if four conditions are satisfied. First, the plaintiff in the federal action must have lost in state court. Second, the plaintiff must complain of injuries caused by the state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. And Fourth, the plaintiff must have commenced the district court proceedings after the state-court judgment was rendered. *See Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 85 (2d Cir.2005). The first and fourth of these requirements have been termed "procedural," and the second and third "substantive." *Id.*

*4 Here, it is clear that the procedural requirements are met: the foreclosure judgment rendered by the Ulster County Court was adverse to the Tribe and was rendered before the commencement of the current action. The parties do dispute, however, whether the substantive requirements of the doctrine have been satisfied.

As noted above, the first substantive requirement is that the plaintiff must complain of injuries caused by the state-court judgment. As to plaintiffs' breach of contract claim, this first requirement is not met. In the foreclosure action, the Ulster County Court held that the 2001 Agreement between the Tribe and the County did not render the Tamarack property immune from taxation or foreclosure. In this action, plaintiffs allege that the County breached the 2001 Agreement by refusing to recognize the Tribe's tax exempt status, refusing to accept PILOT payments, and by commencing and prosecuting the foreclosure action to judgment.[5] (*See* Compl. ¶¶ 170–75, Dkt. No. 1.) It is clear, therefore, that plaintiffs' breach of contract claim implicates issues largely identical to those raised in the foreclosure action. Similarity of claims, however, is alone insufficient to satisfy the "caused by" requirement; instead, the state-court judgment must be the source of the injuries complained of in federal court.[6] *See Hoblock,* 422 F.3d at 87–88; *McKithen v. Brown,* 481 F.3d 89, 98 (2d

Cir.2007). In this case, despite the similarity of issues at play, plaintiffs' breach of contract claim appears to seek redress for injuries independent of the harm caused by the foreclosure judgment. Plaintiffs contend, for example, that they sustained damages as a result of being required to pay taxes as opposed to the lesser PILOT payments, and that they had to incur costs in defending the foreclosure action. These injuries stem from the alleged breach of the contract, not from the foreclosure judgment. Accordingly, plaintiffs' breach of contract claim is not barred by the *Rooker–Feldman* doctrine.

The same is true of plaintiffs' claim for declaratory relief. As summarized above, plaintiffs seek a declaration that the Tribe is a sovereign Indian Nation and that the Tamarack property is "Indian Country" and is therefore tax exempt. (*See* Compl. ¶ 160, Dkt. No. 1.) While this request clearly implicates issues addressed in the foreclosure judgment, it does not appear to seek relief from an injury caused by that judgment. Significantly, the complaint and the parties' submissions set forth facts indicating that a dispute over these issues arose prior to the commencement of the foreclosure proceedings, *see McLamb v. County of Suffolk*, 280 Fed. Appx. 107, 108 (2d Cir.2008),[7] and plaintiffs do not allege that the injuries arising from this dispute were caused by the foreclosure judgment. Rather, the injuries alleged here—which include the payment of taxes and a limitation on the use of the Tribe's land—stem from the County's allegedly improper failure to acknowledge the Tribe's sovereignty and the Tamarack property's status as "Indian Country," a source independent of the Ulster County Court's judgment. Accordingly, as with their breach of contract claim, plaintiffs' request for declaratory relief is not barred by the *Rooker–Feldman* doctrine.

*5 *Rooker–Feldman* is also inapplicable to the Tribe's Nonintercourse Act claim. The County cites no authority for its conclusion that the foreclosure judgment operates under *Rooker–Feldman* to bar plaintiffs' claim for violations of the Nonintercourse Act, (*see* Def. Mem. of Law at 35, Dkt. No. 48:14), and the court is unable to find even a single case in which the Rooker–Feldman doctrine was applied to bar such a claim. The court is aware, however, of at least one case in which a federal court has adjudicated a Nonintercourse Act claim based on foreclosure. *See Oneida Indian Nation of N.Y. v. Madison County*, 401 F.Supp.2d 219 (N.D.N.Y.2005). Therefore, absent authority indicating otherwise, the court rejects the County's *Rooker–Feldman* argument as to the Tribe's Nonintercourse Act claim.

Accordingly, the County's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is denied.

**B. *Summary Judgment***
Although not barred by the *Rooker–Feldman* doctrine, the court finds that the County is nonetheless entitled to summary judgment on each of plaintiffs' claims.

**1. Breach of Contract**[8]
Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y.2002) (citations omitted); *Slamow v. Delcol*, 79 N.Y.2d 1016, 1016 (N.Y.1992) ("The best evidence of what parties to a written agreement intend is what they say in their writing."). Thus, a "motion for summary judgment may be granted in a contract dispute ... when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir.2008) (citation omitted). However, "[w]here contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate." *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990) (citation omitted).

As a threshold matter, whether a contract term is ambiguous presents a question of law for the court. *See Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987); *see also Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 460 (N.Y.1957) ("[W]hen a contract is clear in and of itself, circumstances extrinsic to the document may not be considered and that where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a

question of law ...." (citations omitted)). A word or phrase is ambiguous if it is susceptible to multiple meanings "when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968) (citing, *inter alia*, *Fox Film Corp. v. Springer*, 273 N.Y. 434 (N.Y.1937)).

**\*6** "Ambiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's London*, 136 F.3d 82, 86 (2d Cir.1998). Accordingly, if the court finds the language at issue unambiguous, then it "may construe the contract as a matter of law and grant summary judgment." *Cable Sci. Corp. v. Rochdale Vill., Inc.*, 920 F.2d 147, 151 (2d Cir.1990) (citation omitted). However, "summary judgment is perforce improper unless the terms of the agreement are wholly unambiguous and no material facts are in dispute." *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir.1989) (internal quotation marks and citation omitted).

Here, plaintiffs allege that the County breached the 2001 Agreement when it refused to accept PILOT payments, demanded the payment of property taxes, and commenced tax foreclosure proceedings. (*See* Compl. ¶¶ 170–75, Dkt. No. 1.) In seeking summary judgment, the County argues that it was not automatically obligated under the Agreement to accept PILOT payments, but instead that its obligation to accept the payments was conditional on the Tamarack property becoming tax exempt. In support of this argument, the County relies primarily on the language contained in § A(1)(a)(iv) of the Agreement, which states:

> [T]he County ... understands that the [Tamarack] property *may be tax exempt* in future tax years *in which event* the Tribe agrees to make payments in lieu of taxes to the County for any tax year in which the property is tax exempt....

(Mandell Aff., Ex. B, Agreement and Mutual Release at § A(1)(a) (iv), Dkt. No. 48:2 (emphasis added).)

Plaintiffs dispute the County's interpretation, but fail to offer any alternative reading of the Agreement. Plaintiffs instead attempt to avoid summary judgment by arguing that the County's reading of § A(1)(a)(iv) is inconsistent with other language in the Agreement and in the Resolution, thereby rendering the Agreement ambiguous.

**a. Construction**

Having reviewed § A(1)(a)(iv) in the context of the entire Agreement, the court agrees with the County's interpretation. Initially, the court discerns no ambiguity from the language relied on by the County. Affording it its plain and ordinary meaning, it is clear that the obligation to accept PILOT payments in lieu of taxes was—as indicated by the phrase "in which event"—conditioned on the property becoming tax exempt. The Agreement's statements that the "property *may be* tax exempt in future years," (*id.* (emphasis added)), and that PILOT payments were to be made "[o]n or before March 1 of *every tax year that the property is exempt from payment of property taxes,*" (*id.* at § A(1)(a)(iv) (2) (emphasis added)), are also consistent with that interpretation.

Plaintiffs' argument that other language in the Agreement and Resolution undermines this interpretation is not persuasive. As an initial matter, the Resolution is not part of the Agreement and is therefore not binding with respect to the County's obligation to accept PILOT payments. Rather, the Resolution merely authorized the County to enter into the Agreement and did not limit that authorization to the precise recitals it contained.[9] Moreover, to the extent that the Resolution could be viewed as inconsistent with § A(1)(a)(iv) of the Agreement, it is of no moment. Specifically, as the County correctly points out, the merger clause contained in section E of the Agreement prohibits plaintiffs from relying on

the Resolution to demonstrate ambiguity and defeat summary judgment. Section E(1) reads:

> *7 This Agreement, together with the Exhibits and Schedules hereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters.

(Mandell Aff., Ex. B, Agreement and Mutual Release at § E(1), Dkt. No. 48:2.) This clause, like all merger clauses, operates "to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing."

*Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665, 669 (N.Y.2001); *see also Holloway v. King*, 161 Fed. Appx. 122, 124 (2d Cir.2005) (unpublished). Indeed, "absent an allegation of fraud ... the presence of an integration or merger clause triggers the parol evidence rule," *Holloway*, 161 Fed. Appx. at 125, and extrinsic evidence of a prior writing cannot be used to attack the clarity or meaning of the agreement, *see R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 33 (N.Y.2002) ("Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." (citations and internal quotation marks omitted)). In this case, plaintiffs have not alleged fraud on the part of the County, nor does the record support such an allegation. Accordingly, in light of the Agreement's merger clause, the court is unable to consider the Resolution and therefore rejects plaintiffs' argument in that regard.

Plaintiffs' reliance on other portions of the Agreement to demonstrate ambiguity is also unavailing. The two provisions relied upon by plaintiffs in this regard are §§ A(1)(b) and A(2)(c). Section A(1)(b) provides:

> The County shall not adopt any resolutions or take any other action to contravene the subject matter of the resolutions[, §§ A(1) (a)(i)-(iv),] or affect the Real Property's trust status and/ or "Indian Country" status.

And section A(2)(c) states, in relevant part:

> The Tribe hereby waives its right to sovereign immunity only to the extent of and in connection with the enforcement by the County of the Tribe's obligations hereunder, including but not limited to its obligations to make payments in lieu of property taxes as herein provided.

It is not clear to the court—and plaintiffs fail to adequately explain—precisely how this language could be viewed as inconsistent with § A(1)(a)(iv). In the court's view, neither provision conflicts with § A(1)(a)(iv). As stated, § A(1)(b) precludes the County from taking action that "affects the Real Property's trust status and/or 'Indian Country' status."[10] Plaintiffs appear to argue that this pronouncement somehow negates or contradicts the conditional language of § A(1)(a)(iv). The court disagrees. Read in conjunction, the provisions essentially impose on the County two independent obligations: (1) to accept PILOT payments in tax years that the property has tax exempt status, and (2) to refrain from taking action that would impact the Tribe's tax exempt status once obtained. Accordingly, because the court fails to perceive a conflict or inconsistency, plaintiffs' argument as to § A(1)(b) is rejected.

*8 Plaintiffs' argument as to § A(2)(c) also fails. Plaintiffs fail to offer any cogent discussion on how § A(2)(c)—which provides for a limited waiver of the Tribe's right to sovereign immunity—is inconsistent with § A(1)(a)(iv). In the court's view, this provision appears intended to insure that *if and when* the Tribe's property became tax exempt, the Tribe would be prohibited from relying on sovereign immunity to escape its obligation to, among other things,

make PILOT payments. Because plaintiffs' conclusory claims of ambiguity fail to dissuade the court from adopting this interpretation, and because a plain reading of § A(2)(c) fails to cast any doubt on the clarity of A(1)(a)(iv), the court finds no ambiguity and rejects plaintiffs' argument as to § A(2)(c).

**b. Breach**

Having determined the relevant parameters of the County's obligation under the Agreement, the court finds that the County has not breached its obligation. As just discussed, the 2001 Agreement obligated the County to accept PILOT payments in tax years that the Tamarack property is tax exempt. There is no indication in the record that the Tamarack property was *ever* granted tax exempt status, and it does not appear that plaintiffs claim otherwise. Rather, plaintiffs contend that the Tribe's property is tax exempt by virtue of the Tribe's "inherent sovereign immunity." (*See* Pls. Mem. of Law at 8, Dkt. No. 63.) This argument fails.

Under federal law, real property owned by Indian tribes is not automatically exempt from state and local taxation. Instead, such property becomes exempt only where the owning tribe is federally recognized and the real property is held in trust by the United States government for the benefit of that tribe. *See* 25 U.S.C. § 465; *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 219–21 (2005). In this case, neither requirement has been met. As plaintiffs concede, "there has never been a legal determination of the issue of whether the Tribe is a sovereign Indian Nation." (Pls. Mem. of Law at 16, Dkt. No. 63.) Moreover, as of August 11, 2009, the Tribe has not appeared on the official list of federally-recognized tribes that is published in the Federal Register.[11] *See* Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 74 Fed.Reg. 40,218, 2009 WL 2430736 (Aug. 11, 2009). Similarly, plaintiffs do not allege—and there is no indication in the record—that the property is or was held in trust by the United States Government or that the Tribe has even applied to have it so held.

Accordingly, absent evidence that the Tamarack property was tax exempt at the relevant times, the court finds that the County's obligation to accept PILOT payments had not arisen and that the County did not breach the Agreement by refusing those payments, demanding property taxes, or commencing foreclosure proceedings. Plaintiffs' breach of contract claim is therefore dismissed. *See Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir.2000) ("To prevail on a breach of contract claim under New York law, a plaintiff must prove[, among other things,] ... breach by the other party ...." (citation and internal quotation marks omitted)).

**\*9** In addition, because plaintiffs' "causes of action" for an injunction and "specific performance" of the 2001 Agreement cannot survive absent findings that the Tamarack property is tax exempt and that the County is obligated to accept PILOT payments, (*see* Compl. ¶¶ 161–68, 183–90, Dkt. No. 1), plaintiffs' complaint is also dismissed insofar as it seeks injunctive relief and specific performance.

**2. Declaratory Judgment**

As in the 2006 Action, plaintiffs seek a declaration that the Tribe is a sovereign Indian Nation and that the Tamarack property is "Indian Country" and is therefore tax exempt. In its motion for summary judgment, the County argues that the court should, as it did in the 2006 Action, decline to exercise jurisdiction over this claim.

Under the Declaratory Judgment Act, a district court has the authority to grant declaratory relief "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). That authority is discretionary, however, and confers no "absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995); *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 165 (2d Cir.2006) ("The Act does not require the courts to issue a declaratory judgment."). In deciding whether to entertain a declaratory judgment action, a court must consider a number of factors. *See N.Y. Times* Co., 459 F.3d at 167 (citing *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir.2003)). Those factors include:

> (i) whether the judgment will serve a useful purpose in clarifying or settling the finalize the controversy

and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for "procedural fencing" or a "race to res judicata"; (iv) whether the use of a declaratory judgment would increase

friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy.

*Id.* (citation and internal quotation marks omitted).

Here, having considered the relevant factors, and for largely the same reasons articulated in this court's January 7, 2008 Memorandum–Decision and Order, *see BGA, LLC,* 2008 WL 84591, at *3, the court declines to exercise jurisdiction over plaintiffs' claim for declaratory relief and therefore dismisses it.

### 3. Nonintercourse Act

The Nonintercourse Act (the Act) restricts the alienation of Indian land without Congressional approval. *See* 25 U.S.C. § 177; *Sherrill,* 544 U.S. at 204 & n. 2. It states, in relevant part:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177. To establish a prima facie case for a violation of the Act, a plaintiff must show, among other things, that "it is an Indian tribe." *Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 56 (2d Cir.1994); *Catawba Indian Tribe of S.C. v. South Carolina,* 718 F.2d 1291, 1297 (4th Cir.1983) ("[An e]ssential element[ ] of a cause of action under the Nonintercourse Act [is] proof that the complainant is an Indian tribe...."). A plaintiff satisfies this requirement if it has been recognized as an Indian tribe by the Bureau of Indian Affairs (BIA).[12]

*See Golden Hill,* 39 F.3d at 60. BIA recognition, however, is not the sole means of establishing tribal status for purposes of the Act. *See, e.g., Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 377 (1st Cir.1975) ("There is nothing in the Act to suggest that 'tribe' is to be read to exclude a bona fide tribe not otherwise federally recognized."). Rather, federal courts have the power to determine in the first instance whether a unrecognized group of Indians is "an Indian tribe."[13] *See Golden Hill,* 39 F.3d at 59 (citing, *inter alia, United States v. Candelaria,* 271 U.S. 432, 442 (1926)). But while courts *may* make this determination, they are not required to. Instead, under the doctrine of primary jurisdiction,[14] courts may defer resolution of the issue to the BIA. *Id.* at 60. In fact, given the complexity of the inquiry and the potential for inconsistent and under-informed rulings, deference to the BIA is generally preferred. As the Second Circuit explained in *Golden Hill,* "the acknowledgment process currently set forth in 25 C.F.R. Part 83—a comprehensive set of regulations, the BIA's experience and expertise in implementing these regulations, and the flexibility of the procedures weigh heavily in favor of a court's giving deference to the BIA." *Id.* at 60; *see, e.g., United Tribe of Shawnee Indians v. United States,* 253 F.3d 543, 551 (10th Cir.2001) ("Determining whether a group of Indians exists as a tribe is a matter requiring ... specialized agency expertise."). This is especially so, the Circuit continued, where a plaintiff has already invoked the BIA's authority and has an application for recognition pending. *Id.* (explaining that "deferral is fully warranted" under such circumstances).

*10 In this case, an application for tribal recognition of the Tribe remains pending with the BIA. (Roberts Aff., Ex. L, Status Summary of Acknowledgment Cases at 8, Dkt. No. 62:12.) In light of that application, the County argues that the court should defer resolution of the issue of tribal status to the BIA and dismiss the Tribe's Nonintercourse Act claim. In attempting to avoid deferral, plaintiffs argue that the Tribe never sought recognition through the BIA and that the pending application is, in essence, the result of error and the "possible animus" of the BIA against the

Tribe. (*See* Pls. Mem. of Law at 40–46, Dkt. No. 63.) Specifically, the Tribe claims that its submission to the BIA is not an application for recognition, and that, in any event, the Tribe has repeatedly attempted, without success, to withdraw that submission.

The court agrees with the County that deferral is warranted. As an initial matter, this court, like most district courts, is "ill-equipped to assess the anthropological, political, geographical, and cultural minutiae necessary to determine whether [the Tribe] qualifies as a tribe under the [Act]." *See N.J. Sand Hill Band of Lenape & Cherokee Indians v. Corzine,* Civ. No. 09–683, 2010 WL 2674565, at *14 (D.N.J. June 30, 2010). Indeed, as this Circuit acknowledges, the BIA is in a far better position to determine tribal status than is the judiciary. *See Golden Hill,* 39 F.3d at 60–61. Moreover, the court rejects plaintiffs' argument that the Tribe has not sought BIA recognition. Their contentions in this regard are belied by correspondence between the Tribe and the BIA, (*see* Mandell Aff., Exs. H, J, Application and Correspondence, Dkt. Nos. 48:4, 48:9), and the court therefore declines to credit them. Furthermore, while the Tribe does offer support for its contention that it has attempted to withdraw or cancel its submission to the BIA, other correspondence sent by the Tribe following those attempts undermine that contention and suggest that the Tribe sought further consideration of its submission.

Regardless, even if the Tribe's application for recognition is, as the Tribe contends, no longer pending, the court would nonetheless defer to the BIA for guidance.[15] Specifically, the court is highly reluctant to address the issue of tribal status given the Tribe's history of questionable practices in seeking recognition. The court is particularly troubled by the deficiencies of the Tribe's submission to the BIA, which, according to the BIA, included deficiencies in documentation, unverifiable statements, altered original documents, and omissions in all areas required under the regulations. (*See* Mandell Aff., Ex. J, BIA Technical Assistance Review Report at 29–50, Dkt. No. 48:10.) The Tribe's alleged attempt to withdraw or cancel its submission after this negative report, only to later seek the same recognition in federal court, raises further suspicion. And finally, the court's concern is further heightened by the fact that the Tribe's leader, Ronald A. Roberts, whose affidavit was submitted in support of the Tribe's claims, was convicted of and later pled guilty to making and using materially false writings in connection with the Tribe's submission to the BIA. (*See* Mandell Aff., Ex. M, Dkt. No. 48:10.) Given this history, the court would have little confidence in the integrity of the materials submitted by the Tribe in favor of recognition, and would therefore have little confidence in its ability to wade through an already complex area of law and render a well-informed, well-reasoned determination. This is especially so since this court, unlike the BIA, lacks the experience and expertise needed to ferret out the subtle, yet potentially significant, deficiencies that could present themselves in the tribal status inquiry.

*11 Accordingly, in light of this history and the fact that the Tribe has already invoked the BIA's authority, the court finds that deferral of the tribal status issue and dismissal of the Nonintercourse Act claim at this juncture is fully warranted.

### V. *Conclusion*

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the County's motion to dismiss (Dkt. No. 48) is DENIED; and it is further

**ORDERED** that the County's motion for summary judgment (Dkt. No. 48) is **GRANTED** and plaintiffs' complaint is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3338958

## Footnotes

1. 25 U.S.C. § 177.
2. "BGA is one of the financers of [the Tribe] for purposes of developing a casino." (Def. SMF ¶ 11, Dkt. No. 48:15.)
3. Although the Settlement Agreement provided that defendants would not oppose a motion to vacate the foreclosure judgment, it appears that plaintiffs have not filed such a motion.
4. As noted above, the 2006 Settlement Agreement provided that the parties would treat the Ulster County Court foreclosure judgment as a nullity. However, because neither party directly addresses the effect of this provision on the present litigation in any meaningful way, and because treating the Agreement as non-binding will not alter the court's ultimate resolution of the issues before it, the Agreement will be treated as non-binding for purposes of this motion.
5. In full, the complaint alleges that the County breached the Agreement by: (1) "contravening the subject matter of the Resolution and by taking other actions that affect the Property's 'trust status' and/or 'Indian Country Status' "; (2)"refusing to recognize the Tribe's tax exempt status and sovereign immunity and the Tribe's right under the 2001 Agreement and Resolution to pay Pilot Payments, in lieu of taxes"; (3) "rejecting the Tribe's Pilot Payments which were timely tendered in accordance with the 2001 Agreement and the Resolution"; (4) "commencing and prosecuting the Foreclosure Action to judgment"; and (5) "enforcing a lien for taxes in excess of the Pilot Payments due [under the 2001 Agreement]." (Compl.¶¶ 170–75, Dkt. No. 1.)
6. In explaining this principle, the Second Circuit has offered the following example: "Suppose a state court, based purely on state law, terminates a father's parental rights and orders the state to take custody of his son. If the father sues in federal court for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent, he is complaining of an injury caused by the state judgment and seeking its reversal. This he may not do, regardless of whether he raised any constitutional claims in state court, because only the Supreme Court may hear appeals from state-court judgments."*Hoblock*, 422 F.3d at 87. On the other hand, the Circuit continued, "[s]uppose a plaintiff sues his employer in state court for violating both state anti-discrimination law and Title VII and loses. If the plaintiff then brings the same suit in federal court, he will be seeking a decision from the federal court that denies the state court's conclusion that the employer is not liable, but he will not be alleging injury from the state judgment. Instead, he will be alleging injury based on the employer's discrimination. The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by *Rooker–Feldman*, of the state-court judgment ." *Id.* at 88.
7. In *McLamb*, the Second Circuit explained that a party does not complain of an injury "caused by" a state-court judgment when the injury complained of "existed prior in time to the state-court proceedings" because that injury "could not have been caused by those proceedings." 280 Fed. Appx. at 108 (2d Cir.2008) (citation, emphasis, and internal quotation marks omitted)).
8. Neither party disputes that New York law governs plaintiffs' breach of contract claim. Accordingly, the court will apply New York State substantive law and federal procedural law. *See Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996); *see also Hanna v. Plumer*, 380 U.S. 460, 473–74 (1965); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *McCarthy v. Olin Corp.*, 119 F .3d 148, 153 (2d Cir.1997).
9. In relevant part, the Resolution states:
    [T]he Chairman is *authorized to enter into an appropriate agreement for such conveyance as filed with the Clerk of the Legislature or as modified with the approval of the County or as*

*modified with the approval of the County Attorney* and to execute any and all other further deeds or documents as may be required to effectuate said transfer....
(Mandell Aff., Ex. F, Resolution No. 376 at 2, Dkt. No. 48:3 (emphasis added).)

10   "Indian Country" status can be granted only by the Federal Government and generally affords the designated real property an exemption from state taxation. *See* 18 U.S.C. § 1151 (setting forth the three categories of land that qualify as "Indian Country"); *City of N.Y. v. Golden Feather Smoke Shop, Inc.*, No. 08–CV–3966, 2009 WL 705815, at *12 (E.D.N.Y. Mar. 16, 2009) (explaining that "[t]he common element running through the[ ] three categories is that in each case the land has been designated as Indian country by the federal government").

11   The Secretary of the Interior is required to "publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 479a–1. This list is generally dispositive evidence of whether a tribe is federally recognized. *See Cherokee Nation v. Babbitt,* 117 F.3d. 1489, 1499 (D.C.Cir.1997).

12   The Department of the Interior has promulgated a detailed administrative program known as the "federal acknowledgment process," under which the BIA recognizes American Indian tribes on a case-by-case basis in accordance with a comprehensive set of regulations. *Golden Hill,* 39 F.3d at 57; *see also* 25 C.F.R. §§ 83.1–83.13. To be acknowledged under the regulations, an Indian group must satisfy seven criteria, which are rooted in anthropological, political, geographical, and cultural considerations. *See* 25 C.F.R. § 83.7; *Golden Hill,* 39 F.3d at 59. Satisfaction of these criteria affords a tribe federal recognition as an Indian tribe and bestows on that tribe certain rights and privileges. "Chief among them are quasi-sovereignty and the ability to acquire land (to be held in trust by the federal government)." *N.J. Sand Hill Band of Lenape & Cherokee Indians v. Corzine,* Civ. No. 09–683, 2010 WL 2674565, at *10 (D.N.J. June 30, 2010) (citing 25 C.F.R. § 151.3–4).

13   In making that determination, courts must assess whether the group has shown that it is "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." *Golden Hill,* 39 F.3d at 59 (citations and internal quotation marks omitted).

14   The doctrine of primary jurisdiction "applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." *Golden Hill,* 39 F.3d at 59 (2d Cir.1994) (citations omitted). Or put another way, application of the doctrine is appropriate where "the administrative agency cannot provide a means of complete redress to the complaining party and yet the dispute involves issues that are clearly better resolved in the first instance by the administrative agency charged with regulating the subject matter of the dispute." *MCI Telecomms. Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1103 (3d Cir.1995). Ultimately, "the doctrine seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within the regulatory regime." *Ellis v. Tribune Television Co.,* 443 F.3d 71, 81 (2d Cir.2006) (citation and internal quotation marks omitted).

15   In *Golden Hill,* the Second Circuit left open the question of whether deference to the BIA would be appropriate if no recognition application were pending. 39 F.3d at 60. However, given the central aim of the doctrine of primary jurisdiction—to promote "better informed and uniform legal rulings," *see Ellis,* 443 F.3d at 82—the unique circumstances of this case weigh

overwhelmingly in favor of applying the doctrine here, regardless of whether an application remains pending with the BIA.

**End of Document**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.